UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MARK ALLEN FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1: 17 CV 178 DDN |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying in part the application of plaintiff Mark Allen Foster for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is reversed and remanded for reevaluation of plaintiff's residual functional capacity (RFC).

## I. BACKGROUND

Plaintiff was born on May 25, 1950, and was 65 years old at the time of his hearing. He filed his application on April 17, 2014. He alleged an August 8, 2011 onset date, corresponding to a work injury to his groin, and alleged disability due to a hernia. (Tr. 57-71, 201.) His application was denied, and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 77-96, 146-48.)

On August 1, 2016, following a hearing, an ALJ issued a partially favorable decision finding that plaintiff was disabled during the period between July 4, 2012 and February 10, 2014, following the groin injury and three subsequent surgeries. The ALJ

found that his disability ended as of February 11, 2014 because of medical improvement. The ALJ concluded that as of February 11, 2014, plaintiff had the RFC to perform the full range of "medium" work as defined under the regulations. (Tr. 10-26.) On September 14, 2017, the Appeals Council denied his request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to this appeal. On August 8, 2011, plaintiff sustained a work related injury to his right groin area resulting in three surgeries, steroid injections, and physical therapy over the course of more than two years. (Tr. at 18-9.) The first surgery resulted in serious complications. A surgical revision to remove an errant mesh graft was performed on February 12, 2013 by Dr. Christopher S. Pruitt. Dr. Pruitt also performed a neurectomy (surgical removal of the nerve or part of nerve) and revised his hernia repair during that surgery. (Tr. 366-68.)

In a worker's compensation letter dated February 22, 2013, Dr. Pruitt stated that plaintiff was doing well postoperatively, was better than anticipated, and plaintiff reported he was 30 percent improved from his pre-surgery condition. Plaintiff was sleeping through the night and reported that this surgery had been easier than his first surgery from a pain perspective. Plaintiff rated his pain 5 on a ten-point scale throughout the day, and could increase to 6 or 7 upon getting out of a chair or bed or upon exertion. Dr. Pruett anticipated that he could return to full duty work six weeks after surgery beginning on March 19, 2013. (Tr. 404-05.)

In another follow-up worker's compensation letter dated March 15, 2013, Dr. Pruitt stated that plaintiff was avoiding his right inguinal incision because it was "touchy." He had discomfort in his lower right groin which was actually his right abductor muscle insertion. The area was painful fifteen minutes after exercise and lasted up to one hour. However, his low-central abdominal pain was 99 percent improved since his prior visits. He had some tenderness on examination, but no evidence of a recurrence of hernia. Dr.

Pruitt stated that if his right abductor muscle insertion did not improve he may require a consultation with Robert Hagan, M.D., a neurosurgeon, and /or physical therapy. Dr. Pruitt noted no post-surgical abnormalities. (Tr. 406-08, 426.)

In a final worker's compensation letter dated April 3, 2013, Dr. Pruitt stated that plaintiff had some pain in his low groin. Physical exam indicated he had tenderness at the insertion of his right adductor (groin) muscle groups. Dr. Pruitt determined that plaintiff had reached maximum medical improvement on March 26, 2013. Dr. Pruitt referred him to Dr. Hagan for a possible steroid injection to his right adductor muscle insertion. (Tr. 408-09, 442.)

Plaintiff saw Dr. Hagan on May 28, 2013, and reported recurrent groin pain caused by movement and position of the body. He received a steroid injection at that time. (Tr. 522-23.) On July 31, 2013, Dr. Hagan performed a third surgery, a resection and adductor muscle release, to address plaintiff's pain. (Tr. 550-51.) Dr. Hagan reported plaintiff had done "remarkably well" two weeks post-surgery and experienced a significant decrease in preoperative pain. He was to continue with nonsteroidal medication and Norco for pain control, as well as physical therapy. (Tr. 558.)

Plaintiff saw Dr. Hagan for follow up on September 10, 2013. He reported that his old pain was gone, but he still had some weakness in the medial thigh. He had been ordered to attend physical therapy but had been to only one visit thus far, it was therefore difficult to assess his true progress. His range of motion was near normal, but guarded at the level of the hip. (Tr. 532.)

At an October 17, 2013 follow up with Dr. Hagan, plaintiff had improved significantly overall. He continued to have some deep groin burning pain, but overall his function continued to improve. He seemed guarded in some of his motions. Dr. Hagan limited him to lifting forty five pounds, no squatting or climbing ladders, and no climbing more than twenty stairs at a time. (Tr. 563.)

By November 21, 2013 plaintiff had gradual improvement and improved with physical therapy. He had full range of motion at the hip level. He still had some residual

groin pain that increased with activity. Dr. Hagan expected him to have reached maximum medical improvement and ordered a functional capacity examination (FCE) because of plaintiff's residual persistent pain. Dr. Hagan set a lifting limit of forty pounds and limited squatting and climbing. He recommended that he transition to a local doctor. (Tr. 527-28.)

Plaintiff underwent an FCE on December 17, 2013 to quantify his maximum voluntary physical capacity. (Tr. 512-21.) Among other things, the FCE found significant limitations in squatting, balancing, and crawling. After the FCE, plaintiff's pain was at a level of seven. (Tr. 514.) Dr. Hagan summarized the FCE in worker's compensation correspondence dated February 10, 2014, stating plaintiff had significant improvement in his overall pain and function, but still had residual pain. Dr. Hagan noted that plaintiff maintained good posture, good flexibility, and good strength through the muscle groups tested. Joint integrity was normal through the lower extremities and hip, and his ranges of motion in the hip and lower extremities were nearly symmetrical. Dr. Hagan concluded that plaintiff could occasionally lift up to sixty pounds, frequently lift thirty pounds, and continuously lift up to twelve pounds. He assigned a partial disability rating of twelve percent of the right groin due to residual pain and motion limitations. (Tr. 527.)

On May 7, 2014, plaintiff began seeing Steven D. Mellies, D.O., a neurologist located closer to his home. He had occasional discomfort down his anterior and medial thigh. He was not currently taking any medication but was not able to return to work. Dr. Mellies noted no wasting of muscle groups or fasciculation (muscle twitching) in the right leg. He had good hip flexion, knee extension, ankle extension, and plantar flexion of the ankle. He seemed able to ambulate without difficulty. Dr. Mellies diagnosed plaintiff with residual neuralgia and prescribed gabapentin. (Tr. 594-96.)

Dr. Mellies retired and plaintiff began seeing another neurologist, Robert Gardner, M.D. (Tr. 598-604.) On August 11, 2014, plaintiff reported that an increase in his gabapentin helped. He requested narcotics for pain in his right groin area that he

experienced with increased activity. Dr. Gardner suggested referral to a pain clinic. Plaintiff declined and said he would take care of that himself. (Tr. 605.)

On August 17, 2015, plaintiff saw physician's assistant Amy Shelton for refills on his gabapentin. He reported some nerve pain in the right anterior thigh that was controlled well with gabapentin. He was also taking hydrocodone–acetaminophen as needed for pain. He denied weakness, numbness, or tingling, and was otherwise doing well. Ms. Shelton prescribed hydrocodone, refilled his gabapentin, and instructed him to follow up with his primary care provider, Stanley G. Jones, M.D. (Tr. 637-38.)

Plaintiff saw Dr. Jones on November 3, 2015 for pain medication refills. He was experiencing more groin pain. The gabapentin was not working well and he wanted to stay off opiates. Dr. Jones increased his gabapentin. (Tr. 658-60.)

On January 18, 2016, plaintiff saw Dr. Jones for follow-up. He reported the gabapentin was not working when he was active and that he had pain when he stretched his right lower quadrant. He reported a dull pain that he rated two on a ten-point scale. His right hip was not tender and he had full range of motion in the hips without pain. (Tr. 655-56.)

At his February 18, 2016 appointment with Dr. Jones, plaintiff had full range of motion without hip pain although he reported a pain level of four. He had good strength in both lower extremities. (Tr. 651-52.)

On March 21, 2016, plaintiff reported increased pain and rated it five on a ten-point scale. His right hip was nontender and he had full range of motion without pain and normal strength in the bilateral lower extremities. (Tr. 647-48.) In correspondence, Dr. Jones stated that he believed plaintiff was disabled at this time. (Tr. 641).

During the pendency of the case, plaintiff reached retirement age and began collecting retirement benefits. (Tr. 51.)

**ALJ Hearing**

On May 17, 2016, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 43-76.) He is unable to work due to pain in his groin at the top of his leg. He experiences pain if he stands for more than fifteen minutes. He lives by himself and is able to do some things like wash dishes but he cannot vacuum. (Tr. 60-62.) He feels OK if he sits still on the couch but any kind of housework causes pain. He can do small loads of laundry but cannot hang anything up. He can no longer ride horses and can manage his dogs by holding them on his left side. He takes gabapentin every day and hydrocodone as needed. (Tr. 64-68.)

A vocational expert (VE) also testified at the hearing. The VE testified that plaintiff's past work included general hardware sales person, classified as light semi-skilled work. Plaintiff performed it at the heavy level, however. (Tr. 53, 69-70.)

### III.   DECISION OF THE ALJ

On August 1, 2016, the ALJ issued a partially favorable decision. (Tr. at 10-26.) The ALJ concluded that plaintiff had the severe impairment of status post multiple hernia surgeries. He concluded that plaintiff had not engaged in substantial gainful activity between July 4, 2012, and February 10, 2014, and that he had the capacity to perform a range of sedentary work during that time. (Tr. 17-18.) The ALJ found that, by operation of Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App'x 2, plaintiff was disabled for the period between July 4, 2012 through February 10, 2014. (Tr. 21.)

The ALJ also found, however, that plaintiff's RFC improved as of February 10, 2014, and that he maintained the capacity to perform medium work. (Tr. 22.) Because he could perform his past work as a sales associate, the ALJ found that plaintiff was not disabled beginning February 11, 2014. (Tr. 21.) Plaintiff appeals the ALJ's conclusion that he was no longer disabled after February 10, 2014.

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to his PRW, the burden shifts to the

Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in concluding that he was no longer disabled after February 10, 2014. He argues that the ALJ's finding that he could perform a full range of medium working beginning February 11, 2014 is not supported by substantial evidence. He contends the record evidence does not support the conclusion that his condition drastically improved. He also contends that the ALJ failed to consider all of the results of the FCE and in giving great weight to the opinion of Dr. Hagan. Therefore, the issue is whether there is substantial record evidence to support the ALJ's determination that plaintiff had the RFC to perform medium work beginning February 11, 2014. The Court thinks not.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. Defendant has the burden of proof for an assessment of RFC that will be used to prove that a claimant can perform other jobs in the national economy. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).

In this case, the ALJ determined that plaintiff had medical improvement after February 10, 2014, related to his ability to do work and his RFC had increased to the

medium duty level. The ALJ determined that as of February 10, 2014, plaintiff could lift up to sixty pounds occasionally, lift up to thirty pounds frequently, and lift up to twelve pounds constantly. In finding plaintiff capable of performing the exertional tasks of medium work, the ALJ principally relied on Dr. Hagan's opinion, which in turn was based on plaintiff's FCE. The FCE, however, found plaintiff had significant limitations in squatting, balancing, and crawling. (Tr. 514.) The examination also caused plaintiff an increase in pain. (Tr. 513.)

The regulations define medium work as:

> [L]ifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.
>
> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping. (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing and pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semi-skilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

(SSR 83-10).

As stated above, a key component of medium work is bending, stooping, and flexibility of the body. Here it does not appear the ALJ took flexibility considerations into account. The ALJ relied heavily on Dr. Hagan's opinion which was based on plaintiff's FCE. (Tr. 19, 22, 24-25.) The FCE found plaintiff had significant limitations in squatting, balancing, and crawling. The examination also caused an increase in pain. (Tr. 513-14.) These limitations were never addressed by the ALJ. The ALJ determined that plaintiff's hernia complications had improved and he had pain relief with prescribed medications. The ALJ stated "there is no consistent medical reason why the claimant, despite his established impairment, since February 11, 2014, could not still do medium work, as described in the residual functional capacity." (Tr. at 25.) However, the mere fact that plaintiff's hernia condition has improved does not mean in and of itself that plaintiff can do medium work. Plaintiff continued treatment for his condition after being released by Dr. Hagan in February 2014. Plaintiff testified at the hearing that he is able to do simple chores and perform basic hygiene and grooming, but relies on neighbors for other chores. He feels OK if he sits still on the couch, but any kind of housework such as making the bed causes pain. He can do small loads of laundry but cannot hang anything up. He can no longer ride horses but can manage his dogs by holding them on his left. (Tr. 64-68.) The ALJ failed to explain how plaintiff's limited daily activities translate to an ability to perform the exertional tasks required in medium work. The Court also finds persuasive plaintiff's contention that the ALJ relied too heavily on the opinion of Dr. Hagan, which was based solely on a one-day functional capacity evaluation.

The determination of residual functional capacity must be based on all the evidence in the record. Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002). Here the Court concludes the ALJ's RFC assessment is not supported by substantial evidence. This case is remanded for reevaluation of plaintiff's RFC, and, if necessary, consultation with a VE regarding all of the limitations supported by the evidence. In light of this conclusion, the Court need not address plaintiff's other arguments.

## VI.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner of Social Security is reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g).  On remand, the ALJ shall reevaluate plaintiff's residual functional capacity.  An appropriate Judgment Order is filed herewith.

        /s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 6, 2018.